**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---
IBN EL AMIN PASHA,                    :
                                      :
                Petitioner,           :        Civ. No. 19-3701 (GC)
                                      :
        v.                            :
                                      :
ATTORNEY GENERAL OF THE STATE :        **OPINION**
OF NEW JERSEY, et al.,                :
                                      :
                Respondents.          :
---
                                      :

**CASTNER, District Judge**

## I.    INTRODUCTION

Petitioner, Ibn El Amin Pasha, a/k/a James Coleman (hereinafter "Petitioner" or "Pasha),

is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  Petitioner raises several ineffective assistance of trial and appellate counsel claims in this

habeas petition.  For the following reasons, the habeas petition is denied and a certificate of

appealability shall not issue.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioner had two separate trials after the New Jersey Superior Court, Law Division

severed several counts of Petitioner's indictment.  In the first trial, a jury found Petitioner guilty

of stalking, making terroristic threats, and two lesser included false imprisonment counts.  The

jury found Petitioner not guilty on three kidnapping counts as well as one lesser included count of

false imprisonment.  Petitioner was also found not guilty on one count of aggravated assault and

one count of sexual assault at his first trial.  The jury hung on three counts of criminal mischief,

one count of possession of a firearm for an unlawful purpose, one count of threatening to kill and

one count of aggravated assault.  At the second trial, a jury found Petitioner guilty on three counts

of criminal mischief, one count of terroristic threats, one count of possession of a weapon for an

unlawful purpose, one count of burglary, one count of theft and two counts of murder.  *See State*

*v. Pasha*, No. 04-03-0255, 2008 WL 2917172, at *1 (N.J. Super. Ct. App. Div. July 31, 2008).

Petitioner received a sentence of 168 years imprisonment.  *See id.*

Most of the facts giving rise to Petitioner's convictions were adequately set forth by the

New Jersey Superior Court, Appellate Division on Petitioner's direct appeal as follows:

> The murder victims were Shani Jones Baraka, sister of defendant's estranged wife, Wanda Wilson, and Rayshon Holmes, a friend of Baraka's.  Wilson was the victim of the great bulk of the remaining counts. . . .
>
> Wilson met defendant through mutual friends.  At the time, she held a position as an executive administrator at a bank in New York City.  She earned a comfortable salary and owned a home in Piscataway that she shared with her half-sister, Shani Jones Baraka.  Defendant was unemployed and without a permanent residence.  Wilson was nonetheless attracted to him.  The two began to date, and she lent him funds to start a business.  He moved into her home, and they were married in February 2000.
>
> Trouble developed in the marriage, however, due to defendant's habit of pursuing other women.  By February 2003, the two were separated.  Wilson, however, continued to provide money to defendant even in the face of several incidents in which defendant showed up at Wilson's home and attacked and threatened her.  We do not consider it necessary to set forth all the incidents to which Wilson testified, nor the particular details.  A summary will suffice for purposes of this opinion.
>
> On April 27, 2003, defendant came to Wilson's home, demanding to be admitted.  She would not let him in and eventually summoned the police.  Defendant was no longer there by the time the police arrived.  One of the officers who responded advised Wilson that she should obtain a restraining order against defendant.  Although Wilson did obtain such an order, it was never served upon him.
>
> In June 2003 Wilson met James Hill, Jr., and formed a relationship with him.  Defendant came to the house and threatened Wilson,

holding a gun to her head. The following day, Wilson left her house and went to stay with Hill. She returned to the house on June 17, 2003, with a cousin and a friend and instructed the friend how to care for the pool that was on the property. She gave him keys to her car so that he could use it to get back and forth from his apartment in Newark to the home in Piscataway. She then returned to Hill's home.

The following day, Wilson's friend called her to tell her that Wilson's car had been set afire. In addition, the car's windows had been broken and its tires slashed. Defendant called Wilson the day after, asking if she was upset about her car. He said he had destroyed the car because he had overheard her giving her friend instructions on caring for the pool and wanted to deprive him of a way of getting back and forth.

Later in the month, she returned to the house and found that someone had entered, triggering the security alarm. Pictures of Wilson and Hill were missing. In early July, her pool was vandalized on several occasions and the water contaminated with motor oil.

In addition, defendant continued to contact Wilson on her cell phone and at work, at times calling up to twenty times a day. She arranged to have a security escort at work, while entering and leaving the building.

On August 8, 2003, Wilson and Hill went to Las Vegas. The night before their departure, Wilson gave Hill's seventeen-year-old son a key to the house and asked him to watch over the dog while they were gone. [FN 1] While Wilson was showing the house to the boy, he saw two leather motorcycle jackets in a closet. Wilson did not like her jacket and the boy asked if he could have it; she said he could wear it when the cold weather came.

> [FN 1] There was testimony that the dog, a pit bull, had belonged to Hill's son and that Hill had asked his son to lend it to Wilson as protection.

Hill's son came to the house on August 12, together with his girlfriend and nine-year-old cousin. All of the lights on the second floor of the house were on. The older boy and his girlfriend went to check upstairs, and the young cousin went to check on the dog in the basement. He came upstairs screaming that were [sic] bodies down there. His older cousin called his father in Las Vegas, and Wilson called the police. They responded to the house and found the bodies of Baraka and Holmes, both of whom had been shot to death.

The police sought to question defendant but were unable to locate him at first. Defendant was staying with a friend in North Carolina. On learning that the police were looking for him, he asked his friend to drive him to New Jersey so that he could turn himself in. His friend told police that defendant had been with him the entire weekend of the murders. Subsequent investigation, however, produced several witnesses who could place defendant in the area at the time of the murders.

Holmes had owned a Toyota Land Cruiser, but the vehicle was missing at her death. The vehicle was equipped with an EZ-Pass transponder which tracked the vehicle through New Jersey down to the Fort McHenry Tunnel in Maryland. It was eventually discovered about four months later in Virginia, at a spot very close to a Greyhound Bus Terminal. The bus company records showed that a one-way ticket to Winston-Salem had been purchased by "Rob Carpenter" on August 12, 2003. The friend with whom defendant had been staying in North Carolina and who drove him back to New Jersey was Robert Carpenter.

Based upon that information, the police interviewed Carpenter again, and he eventually admitted that he had spent that weekend with his girlfriend and not defendant. The police asked if defendant had left anything behind in Carpenter's home. Carpenter showed them two motorcycle jackets. Wilson identified them as the jackets which had been in her closet which Hill's son had asked about.

Carpenter also said defendant had given him several pieces of jewelry to pawn. The police recovered the items, and Wilson identified them as belonging to her sister and to herself.

*Pasha*, 2008 WL 2917172, at *1–3.

The New Jersey Superior Court, Appellate Division affirmed Petitioner's convictions on direct appeal.[1] *See id.* at *15. The New Jersey Supreme Court then denied certification. *See State v. Pasha*, 960 A.2d 744 (N.J. 2008).

---

[1] The Appellate Division remanded the matter for a corrected judgment after noting that the judgment of conviction improperly noted that Petitioner was convicted of aggravated sexual assault. *See Pasha*, 2008 WL 2917172, at *14-15.

Petitioner then moved for post-conviction relief ("PCR") before the New Jersey Superior Court, Law Division.  Petitioner's PCR petition raised numerous ineffective assistance of trial and appellate counsel claims.  In March 2015, the Law Division denied Petitioner's PCR petition in a written decision.  (*See* ECF 15-2).  The New Jersey Superior Court, Appellate Division, affirmed that denial on appeal for the reasons given by the Law Division.  *See State v. Coleman*, No. 04-03-0255, 2017 WL 5983090 (N.J. Super. Ct. App. Div. Dec. 1, 2017).  The New Jersey Supreme Court denied certification.  *See State v. Coleman*, 184 A.3d 908 (N.J. 2018).

Petitioner then filed his federal habeas petition in January 2019.  (*See* ECF 1).  Petitioner's original habeas petition raised seventeen claims.  They were as follows:

1.  The trial court abused its discretion in denying Petitioner's motion for a mistrial because Wilson's testimony that Petitioner admitted to committing the murders violated Petitioner's due process right to discovery and rendered the trial fundamentally unfair ("Claim I");

2.  Petitioner's due process right to a reliable identification was violated by the conduct of Detective Manco and the trial court erred in denying Petitioner's motion to dismiss the indictment or in the alternative exclude the out-of-court and in-court identification of Scott Sachs ("Claim II");

3.  The trial court abused its discretion in ruling that counts seven, nine, eleven, twelve, thirteen, fourteen and fifteen be consolidated for trial ("Claim III");

4.  The prosecutor's assertion that Wilson was a "battered woman" was improper because it required expert testimony ("Claim IV");

5.  Ineffective assistance of trial counsel by failing to call Al-Amin Pasha (Petitioner's father) as an alibi witness ("Claim V");

6.  Ineffective assistance of trial counsel by failing to call James Hill Sr. as a witness ("Claim VI");

7.  Ineffective assistance of trial counsel in failing to obtain and use Yasmina King's testimony at trial ("Claim VII");

8.  Ineffective assistance of trial counsel in failing to obtain and use Rachelle Clinton's testimony at trial ("Claim VIII");

9.  Ineffective assistance of trial counsel in failing to use notes that would have impeached Wilson's credibility at trial ("Claim IX");

10. Ineffective assistance of trial counsel in failing to communicate to Petitioner that a plea bargain had been tendered to him by the State ("Claim X");

11. Ineffective assistance of appellate counsel for failing to raise on appeal the trial court's denial of Petitioner's right to cross-examine Wilson about James Hill Sr. ("Claim XI");

12. Ineffective assistance of appellate counsel for not raising on appeal that the State failed to turn over *Brady* material ("Claim XII");

13. Ineffective assistance of appellate counsel for failing to raise on appeal the issue of the trial court's allowance of expert DNA evidence over Petitioner's objection ("Claim XIII");

14. Ineffective assistance of appellate counsel for not raising on appeal the trial court's denial of Petitioner's request for Wilson's financial and marital records ("Claim XIV");

15. Ineffective assistance of trial counsel for failing to request a mistrial after a juror was threatened ("Claim XV");

16. Ineffective assistance of trial counsel for failing to object to prior bad acts testimony of Carpenter who stated Petitioner owned a gun ("Claim XVI"); and

17. Ineffective assistance of trial counsel for failing to request a domestic violence expert testify on Petitioner's behalf ("Claim XVII").

Respondents filed a response in opposition to Petitioner's habeas petition.   (*See* ECF 8). Respondents agued in part that Claims I-IV were unexhausted.  (*See id.* at 35-41).  Petitioner then requested that Claims I-IV be withdrawn, which this Court granted.  (*See* ECF 28 & 34).  Petitioner also submitted a reply in support of his habeas petition on his remaining claims.  (*See* ECF 30).  In April 2022, this matter was reassigned to the undersigned.  (*See* ECF 39).

## III.     LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254).  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under §

2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Furthermore, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct).

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). A petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181.

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson*

*v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Rambo v. Adm'r East Jersey State Prison*, 762 F. App'x 105, 107 (3d Cir. 2019) (noting the applicability of *Ylst*'s "look through" doctrine); *Dennis Sec'y Dep't of Corr.,* 834 F.3d 263, 353 n.10 (3d Cir. 2016) (Jordan, J., concurring in part and concurring in the judgment) (noting that while <u>*Ylst*</u> predates the passage of AEDPA, the *Ylst* presumption that any subsequent unexplained orders upholding the judgment will be presumed to rest upon the same ground is still valid).

## IV.   DISCUSSION

The last reasoned decision on all of Petitioner's ineffective assistance of trial and appellate counsel claims is from the New Jersey Superior Court, Law Division's written decision that denied Petitioner's PCR petition.  Prior to analyzing the specific ineffective assistance of counsel claims, the Law Division outlined the standard associated with Petitioner's ineffective assistance of counsel claims as follows:

> A common argument found within PCR petitions is that a petitioner's representation was constitutionally ineffective.  <u>See, e.g.</u>, <u>State v. Taccetta</u>, 200 <u>N.J.</u> 183, 185 (2009).  However, ineffective assistance of counsel claims are difficult to prove because "[j]udicial scrutiny of counsel's performance [is] highly deferential [due to the] strong presumption that counsel's conduct falls within [a] wide range of reasonable professional assistances . . . ." <u>Strickland [v. Washington]</u>, 466 <u>U.S.</u> [ ] 668, 104 <u>S.Ct.</u> at 2052, 80 <u>L.Ed.2d</u> at 694 [(1984)].  Consequently, "a defendant [challenging his counsel's ineffectiveness] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Id.</u>  A petitioner surmounts this obstacle by establishing the following <u>prima facie</u> elements: "(1) that [his] counsel's performance fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors the result [the defendant's conviction] proceeding would have been different." <u>State v. Loftin</u>, 191 <u>N.J.</u> 172, 198 (2007) (citations omitted).

> When evaluating an attorney's performance against the requisite objective standard, the first <u>prima facie</u> element, this Court "must

avoid second-guessing defense counsel's tactical decisions [and avoid] viewing [such] decisions under the distorting effects of hindsight." [State v.] Marshall (III), [690 A.2d 1, 34,] 148 N.J. [89,] 157 [(1997)].   As such, this Court may only find that "defense counsel was constitutionally deficient, [when. . .] counsel made errors so serious that counsel was not functioning as . . . guaranteed by the Sixth Amendment."   Id. at 156 (citations and internal quotation marks omitted).   Regarding the second prima facie element, "[a] reasonable probability is a probability sufficient to undermine confidence in the [proceeding's] outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.   Petitioners must substantiate the existence of these elements with "specific facts . . . [that], if believed, would provide the court with an adequate basis on which to rest its decision." State v. Mitchell, 126 N.J. 565, 579 (1992).   If a defendant files a PCR petition premised on an ineffective assistance of counsel claim and presents a prima facie case in support of the relief that he requested, then this Court must grant the petitioner an opportunity to participate in the evidentiary hearing. [State v.] Preciose, 129 N.J. [451,] 462 [(1992)].   The Court may only grant the petitioner's request if he "establish[es], by a preponderance of the credible evidence, that he is entitled to the requested relief." State v. Marshall, 244 N.J. Super. 60, 69 (1990) (internal quotation marks omitted).

(ECF 15-2 at 12-13).

A.  Claim V[2]

Petitioner asserts in Claim V that trial counsel was ineffective by failing to call his father, El-Amin Pasha, as an alibi witness at trial.   The Law Division denied this claim based on Petitioner's failure to meet *Strickland*'s prejudice prong.   More specifically, the Law Division stated as follows:

> Pasha contends that El-Amin Pasha, who is Pasha's father, would have testified that Pasha was with him in Newark at the time of the murders, thereby establishing an alibi.   To underscore the importance of alibi testimony, Pasha cites to State v. Mitchell, 149 N.J. Super. 259, 262 (App. Div. 1977), and explains that "few defenses have greater potential for creating reasonable doubt as to a defendant's guilt in the minds of the jury [than an alibi]." Additionally, when a petitioner's trial counsel fails to investigate an

---

[2] For consistency purposes, despite Petitioner withdrawing Claims I-IV, this court will maintain the claim numbers as listed in Petitioner's habeas petition as numbered.

alibi witness, reviewing courts may grant the petitioner his requested PCR.  See State v. Porter, 216 N.J. 343 (2013).  Pasha argues that this alibi would have provided evidence that Carpenter had killed Baraka and Holmes.  As such, Pasha concludes that his trial counsel was ineffective for failing to interview and call El-Amin Pasha to the stand.

In turn, the State maintains that El-Amin Pasha's testimony would not have strengthened Pasha's defense because the State established that Pasha traveled to North Carolina after he murdered Baraka and Holmes.  The State explains that Baraka and Holmes died between 9:00 PM on August 11, 2003 and 1:00 AM on August 12, 2003.  The State concedes that whoever bought the Greyhound bus ticket on August 12 purchased the ticket while using the name Tom Carpenter,[3] but contends that it presented phone records to the jury that showed Pasha was the person who traveled from Virginia to North Carolina.  These records demonstrate that Pasha placed two calls to his voicemail from two Greyhound bus terminals between Virginia and North Carolina and that Pasha called Carpenter from the Greensboro, North Carolina bus station at 8:57 PM on August 12.  The State argues that this evidence, coupled with the undisputed fact that authorities could not locate Pasha after Baraka and Holmes were discovered, establishes that Pasha was not in New Jersey.  Therefore, the State contends that El-Amin Pasha's testimony would not have impacted Pasha's convictions.

This Court finds that Pasha has not met his burden with respect to Al-Amin [sic] Pasha's testimony because Pasha did not establish the second prima facie element of an ineffective assistance of counsel claim.  See Loftin, 191 N.J. at 198.  Considering the evidence that the State provided, including the location of Holmes' truck, the EZ-Pass transponder information, and the phone calls that Pasha made on August 12 from three bus stations, there is no reasonable probability that, but for Pasha's trial counsel's decision not to call El-Amin Pasha to the stand, Pasha's conviction proceedings would have resulted in a different outcome.

(ECF 15-2 at 14-15).

The Sixth Amendment guarantees effective assistance of counsel.  In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for

---

[3] This appears to be a typo as trial testimony indicates that the ticket was purchased by someone using the name "Rob" Carpenter.  (*See* ECF 21-6 at 15).

demonstrating when counsel is deemed ineffective.  First, a petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all circumstances) (citation omitted).  A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  *See Strickland*, 466 U.S. at 690.  Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential."  *See id.* at 689.  Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* at 690.  The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable."  *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).  If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation."  *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of the *Strickland* test requires a petitioner to affirmatively prove prejudice.  *See* 466 U.S at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d

Cir. 2012).  "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case.  The likelihood of a different result must be substantial, not just conceivable."  *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice [. . .] that course should be followed.'"  *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard."  *Grant*, 709 F.3d at 232 (quoting *Harrington*, 562 U.S. at 101).  "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself."  *Id.*  Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential."  *Id.* (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)).  Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)."  *Id.* (internal quotation marks and citations omitted).

The Law Division properly articulated the *Strickland* standard.  This Court must now assess whether the denial of Petitioner's ineffective assistance of counsel claims was contrary to, or an

unreasonable application of, the relevant two-prong *Strickland* standard on each of Petitioner's claims.

The Law Division's denial of Claim V was not contrary to, nor was it an unreasonable application of, clearly established federal law. Furthermore, the denial was not based on an unreasonable determination of the facts. Indeed, the Law Division aptly noted and applied the proper *Strickland* standard in denying this claim based on Petitioner's failure to establish prejudice. The Law Division decided that given the other evidence produced at trial such as: (1) the location of Holmes' truck; (2) the EZ-Pass transponder information; and (3) the location of phone calls that Pasha made led to a conclusion that Petitioner's father's alibi testimony would not have changed the outcome of Petitioner's trial to a reasonable probability. The Law Division's decision does not run afoul of *Strickland*'s prejudice standard and is certainly not an unreasonable application of that standard. *Cf. Haynes v. District Attorney*, No. 14-6993, 2017 WL 696083, at *5 n.2 (E.D. Pa. Feb. 21, 2017) (citing *Hess v. Mazurkiewicz*, 135 F.3d 905, 909 (3d Cir. 1998) (citing *Romero v. Tansy*, 46 F.3d 1024, 1030 (10th Cir. 1995)); *Nelson v. Varano*, No. 11-7257, 2015 WL 1134124, at *18 (E.D. Pa. Mar. 12, 2015)) (noting the unlikelihood that petitioner could demonstrate prejudice as "alibi testimony from a loved one . . . is often less credible than the testimony of a more objective witness, due to the potential for bias."). Therefore, Claim V is denied.

B. Count VI

In Claim VI, Petitioner asserts trial counsel was ineffective for failing to call James Hill Sr. as a witness. The Law Division analyzed and disposed of this claim during Petitioner's PCR proceedings as follows:

> Pasha further argues that his trial counsel was ineffective for failing to take additional steps to impeach Wilson's credibility. . . .

14

Pasha's witness-dependent contentions include assertions that his trial counsel should have called James Hill . . . to the stand.

Pasha contends that James Hill's testimony would have impacted his conviction proceedings because, as per a report that a defense investigator created in 2009, Hill was not aware of any domestic violence issues that existed between Wilson and Pasha, Hill called Wilson a "conniving bitch," and Hill stated that Wilson created the situation that led to the murders of Baraka and Holmes. Pasha avers that these statements raise significant questions regarding Wilson's credibility and Wilson's motives regarding her sister's death. The State responds by supplementing Pasha's summary of the defense investigator's report, explaining that Hill told the defense investigator that he had no idea if Wilson killed Baraka and Holmes, that he did not believe he could help Pasha, and that he would not make a credible witness because he had a prior criminal record. The State also argues that the defense investigator interviewed Hill in 2009, four years after Pasha's trials and five years after Wilson and Hill divorced. The State attributes Hill's derogatory comments to his divorce and emphasizes that nothing Hill told the investigator incriminated Wilson or cast any doubt on Pasha's guilt. . . .

This Court finds that neither Hill's . . . proffered testimony when viewed singularly . . . provide this Court with a reasonable probability that, but for Pasha's trial counsel's failure to call said individual[ ] to the stand, Pasha's conviction proceedings would have resulted in a different verdict. See State v. Loftin, 191 N.J. 172, 198 (2007). . . . Hill admitted to the defense investigator that he did not know if Wilson committed the murders and did not believe that his testimony would have benefited Pasha's defense. For these reasons, Hill's . . . proffered testimony does not undermine the confidence this Court has in the outcome of Pasha's conviction proceedings and does not warrant an evidentiary hearing or PCR. See Strickland, 466 U.S. at 694, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

(ECF 15-2 at 19-21).

The Law Division denied Claim VI based on *Strickland*'s prejudice prong. The denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law such as *Strickland*, nor was the denial based on an unreasonable determination of the facts. This Court has reviewed the investigative report and Hill's certification (ECF 30-2 at 4-8) and

finds that the Law Division's determination that Hill's testimony would not have changed the outcome of the trial to a reasonable probability was not unreasonable.  As noted by the Law Division, Hill told the investigator he had no idea if Wilson killed Baraka and Holmes.  As for Hill's derogatory comments against Wilson given to the investigator, trial testimony already indicated their relationship soured after the murders in any event.  (*See* ECF 21-2 at 36).  Claim VI is denied.

C.  Claim VII

In Claim VII, Petitioner asserts trial counsel was ineffective by not calling Yasmina King as a witness at trial.  Petitioner asserts King could have corroborated the existence of a $500,000 life insurance policy that Wilson had taken out on her sister, Baraka.  The Law Division summarized and denied this claim as follows during Petitioner's PCR proceedings:

> Pasha also asserts that his trial counsel inadequately explored the possibility that another person or persons committed the crimes that correspond with his convictions.  This Court has grouped the relevant arguments into two categories: (1) evidence that Pasha believes his trial counsel should have presented to the juries in his trial and (2) witnesses that Pasha believes his trial counsel should have called to the stand or inappropriately handled on the stand.

> This Court will first address the former category of errors, which includes Pasha's assertions that this trial counsel should have presented evidence that Wilson benefited from her sister's life insurance policies. . . .

> Pasha asserts that defendants have a right to present evidence that a third party was responsible for the crime or crimes that they were accused of committing.  See State v. Timmendequas, 161 N.J. 515, 620 (1999).  Pasha further argues that when defendants seek to introduce evidence of third-party culpability, "[t]he evidence, in order to be admissible, need not establish a probability of [ ] third-party guilt.  [Instead, t]here need only be proof capable of raising a reasonable doubt [regarding the] defendant's guilt."  State v. Millet, 272 N.J. Super. 68, 99-100 (App. Div. 1994) (internal citations omitted).

Specific to life insurance policies, Pasha contends that Wilson was the sole beneficiary of at least one of Baraka's life insurance policies, that Wilson purchased various life insurance policies on Baraka before Baraka was murdered, and that reasonably competent counsel would have used this information to show that Wilson had a motive to frame Pasha and to commit the murders herself. The State acknowledges that Baraka had a single group life insurance policy and that the relevant insurance provider distributed $89,100 to Wilson. However, the State argues that this would not have convinced the jury in Pasha's second trial that Wilson committed or orchestrated her sister's murder. The State further avers that Pasha's accusations of additional life insurance policies stem from on [sic] speculation and information that originates from biased third-parties. Because defendants are not entitled to evidentiary hearings when their claims are speculative, vague, or conclusory, the State maintains that Pasha's trial counsel's failure to investigate and use these claims are not grounds for PCR. State v. Marshall (III), 148 N.J. 89, 158 (1997). . . .

Before delivering this Court's application of the law to the facts presented above, this Court must explain that the standards Pasha provided in his brief regarding third-party guilt have no application to the instant petition. The instant petition should solely address PCR – not the admissibility of evidence. With this fundamental concept in mind, this Court finds that Pasha's third-party guilt evidentiary-based claims are devoid of merit. Pasha's first claim fails because a reasonable attorney might have refused to accuse a murder victim's sister of orchestrating said murder. This is especially true when this alternate theory of death is substantiated by a single insurance policy's proceeds and nothing else. Therefore, Pasha has failed to demonstrate the first prima facie element of an ineffective assistance of counsel claim, see Loftin, 191 N.J. at 198, and that his trial counsel's decision was anything less than sound trial strategy. See Marshall (III), 148 N.J. at 157. . . .

Pasha argues that his trial counsel was ineffective for failing to obtain Yasmina King's testimony and for failing to call her as a witness at trial because her testimony would have raised significant questions regarding Wilson's credibility and established that Wilson had a motive to kill her sister. Pasha explains that a defense investigator spoke with Yasmina King in 2009 and elicited the following information: (1) King was aware of a sizeable life insurance policy that Wilson had taken out for Baraka; (2) King was not aware of any domestic violence between Pasha and Wilson; and (3) Wilson was angry with Baraka because Baraka would have people visit the house and did not contribute to household expenses.

17

The State argues that nothing King told the defense investigator suggests that reasonably competent counsel would have called King as a witness or shows that Wilson was responsible for the instant murders.

This Court finds that Yasmina King's proffered testimony does not provide the Court with specific facts that, if believed, could serve as an adequate basis for a judicial decision. See State v. Mitchell, 126 N.J. 565, 579 (1992).   According to Pasha, Yasmina King's testimony has three important points: (1) that Wilson had taken out a sizeable life insurance policy on Baraka, (2) that neither Pasha nor Wilson told King that Wilson was a victim of Pasha's abuse, and (3) that Wilson was angry with Baraka because Baraka was an inconsiderate housemate.  However, Pasha does not provide proof of such an insurance policy, explain why Wilson might have confided in Yasmina King, or offer any plausible reasons that Wilson would want to kill her sister.  Consequently, this Court finds that the case theories Pasha attempted to further with Yasmina King's potential testimony are nothing more than speculation.

(ECF 15-2 at 15-19).

The Law Division's denial of this claim was not contrary to, nor an unreasonable application of, clearly established federal law nor was the denial based on an unreasonable determination of the facts.  The main thrust of this claim is that King would have "corroborated" the purported fact that Wilson had taken out a separate substantial life insurance policy on her sister, thereby presumably providing a motive that it was in fact Wilson as opposed to Petitioner who was involved in the killing of Baraka.  However, there is nothing in the record to "corroborate."   Indeed, nothing in the record provided for the existence of a separate more lucrative life insurance policy that Wilson took out on her sister.  Given this absence in the record, there is no basis to find that the state court acted contrary to, or unreasonably applied, clearly established federal law such as *Strickland* and its progeny through counsel's failure to call King to the stand.  Furthermore, given this lack of evidence regarding any other life insurance policy, Petitioner fails to show to a reasonable probability that the outcome of his proceeding would have

been different had King been called to testify. This Court finds no fault with respect to the other reasons given by the Law Division for denying this claim. Therefore, Claim VII is denied.

D. <u>Claim VIII</u>

In Claim VIII, Petitioner argues trial counsel was ineffective by failing to call Rachelle Clinton as a witness at trial. The Law Division summarized and denied this claim as follows during Petitioner's PCR proceedings:

> Pasha [argues] trial counsel should have called Rachelle Clinton to the stand so she could refute a discrete portion of Wilson's testimony. At trial, Wilson informed the jury that a contributing factor to her separation from Pasha was that she discovered Pasha had posed for a gay pornographic magazine. Pasha contends that, as per the certification that Clinton provided, which he attached to his instant brief, Clinton would have testified that Wilson knew about the photoshoot, that the photoshoot was Wilson's idea, and that Wilson was at the photoshoot. The State's only response to this argument is that it is irrelevant. This Court agrees with the State and finds Rachelle Clinton's testimony would not have impacted Pasha's conviction proceedings.

(ECF 15-2 at 21-22).

The state court's denial of this claim was not contrary to, nor an unreasonable application of, clearly established federal law, nor was the state court's denial based on an unreasonable determination of the facts. Wilson's testimony regarding the photoshoot was minor to evidence that implicated Petitioner. Petitioner fails to show that the state court's decision was an unreasonable application of *Strickland*'s prejudice prong. Therefore, Claim VIII is denied.

E. <u>Claim IX</u>

In Claim IX, Petitioner argues trial counsel was ineffective by failing to impeach Wilson with her own notes at trial. More specifically, Petitioner asserts that the notes indicate Wilson met with Petitioner after Father's Day in 2003, even though she claimed that she did not know how to

locate Petitioner.  The Law Division analyzed and denied this claim as follows during Petitioner's

PCR proceedings:

> Pasha then asserts that his trial counsel should have presented a note,
> which he claims Wilson wrote, that demonstrates Wilson met with
> Pasha after June 2003.  Again, Pasha contends that reasonably
> competent counsel would have used this note to impeach Wilson's
> credibility.  The State posits that Pasha has not made any showing
> that the disputed note is authentic or that it . . . would have made any
> difference at trial.
>
> This Court agrees with the State. . . . This Court has already
> concluded that impeaching Wilson's single and inconsequential
> statement concerning Pasha's whereabouts would not have
> impacted Pasha's conviction proceedings.  This Court sees no
> reason to further explore this alleged deficiency.

(ECF 15-2 at 22-23).

The Law Division decided this claim on Petitioner's failure to show *Strickland* prejudice.

Given the evidence implicating Petitioner in his convicted crimes, this Court fails to see how the

state court's denial of this claim based on *Strickland*'s prejudice prong was either contrary to, or

an unreasonable application of, clearly established federal law.  Accordingly, Claim IX is denied.

F.  Claim X

In Claim X, Petitioner asserts trial counsel failed to inform him that the State offered a plea

bargain.  The Law Division analyzed and denied this claim as follows during Petitioner's PCR

proceedings:

> Pasha's next argument is that his trial counsel was ineffective for
> failing to inform Pasha that the State had extended a plea offer.  The
> State maintains that even if Pasha's assertion was true, this Court
> cannot award PCR on such grounds because Pasha maintained his
> innocence during trial and during the instant proceedings.  State v.
> Taccetta, 200 N.J. 183 (2009).
>
> This Court agrees with the State.  In Taccetta, the New Jersey
> Supreme Court held that a petitioner seeking PCR could not prevail
> when he argued that his trial attorney was ineffective for failing to

inform him of a plea offer because the petitioner maintained his innocence during his PCR proceedings.  The Court explained that:

> [The petitioner] testified at [his] PCR hearing that he was innocent of [the contested charge], and although he professed that he would have perjured himself to gain the benefit of the plea agreement, our court rules and case law do not permit either the taking of a plea, or the sanctioning of one, that is based on a known lie.  Because a trial court cannot give its seal of approval to, or become complicit in, a defendant's plan to commit perjury at a plea hearing, a PCR court, engaging in a hindsight review, cannot hold that a plea would have been acceptable had [the petitioner] lied under oath.

Id. at 186.

Applying the Taccetta Court's logic to the instant circumstances, Pasha's instant argument cannot succeed.  Pasha repeatedly asserted his innocence during both of his trials and all of his post-conviction relief proceedings.  Therefore, this Court cannot grant Pasha PCR due to his trial attorney's failure to reopen plea negotiations – even if his trial attorney had taken such action, any resulting plea would have included perjury and the trial court could not have lawfully accepted it.  See id.  This means that a jury would still have to determine Pasha's guilt or innocence and that Pasha has not satisfied an ineffective assistance of counsel claim's second prima facie element.  See Loftin, 191 N.J. at 198.  Therefore, this Court will not grant Pasha an evidentiary hearing on this matter.

(ECF 15-2 at 31).

Defendants have a constitutional right to effective assistance of counsel during plea negotiations. *See Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985).  To prevail on a claim of ineffective assistance of counsel, as previously noted, Petitioner is required to establish that counsel's performance "fell below an objective standard of reasonableness" and caused him prejudice.  *See Strickland*, 466 U.S. at 687.  In the plea-bargaining context, a petitioner must first establish a reasonable probability that the plea agreement would have been consummated.  *See Missouri v. Frye*, 566 U.S. 134, 147 (2012).  This requires a reasonable probability that: (1) "the [petitioner]

would have accepted the plea," (2) "the prosecution would not have withdrawn it in light of intervening circumstances," and (3) "the court would have accepted its terms." *Lafler v Cooper*, 566 U.S. 156, 164 (2012).  The petitioner must then "show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Frye*, 556 U.S. at 147.

Courts have questioned whether a petitioner who maintains his innocence can make the required showing to prevail in an ineffective assistance claim under *Lafler*. *See, e.g., United States v. Tarnai*, 782 F. App'x. 128, 132 (3d Cir. 2019) ("[Petitioner] has not established the government would have allowed him to take the plea while insisting on his innocence."); *Humphress v. United States*, 398 F.3d 855, 859 (6th Cir. 2005) (noting that defendant's assertion of innocence undermined his contention that he would have accepted a plea deal); *Sanders v. United States*, 341 F.3d 720, 723 (8th Cir. 2003) ("A defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be unwilling to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer."); *United States v. Stevens*, 149 F.3d 747, 748 (8th Cir. 1998) (concluding that defendant could not establish prejudice when his post-trial assertions of innocence demonstrated that he would not have entered a guilty plea).

In *Davis v. Administrator New Jersey State Prison*, 795 F. App'x. 100, 102–03 (3d Cir. 2019), a panel of the Third Circuit affirmed the denial of habeas relief in a similar claim as the one raised by Petitioner as follows:

> The [New Jersey] Appellate Division held that [petitioner] could not meet *Strickland's* prejudice prong because he consistently maintained his innocence, including "denying his guilt and indicating his whereabouts away from the crime scene on the night of the shooting" during his testimony at trial.

As the *Taccetta* court explained, "[t]he notion that a defendant can enter a plea of guilty, while maintaining his innocence, is foreign to our state jurisprudence" and "[c]ourt-sanctioned perjury is not a permissible basis for the entry of a plea in [New Jersey]." 975 A.2d at 935.

Applying *Taccetta*, the Appellate Division concluded that [petitioner] could not have accepted a favorable plea deal as a matter of New Jersey law. We cannot "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* Here, we can find no such violation. [Petitioner] asserts no federal right to plead guilty in this circumstance. *See North Carolina v. Alford*, 400 U.S. 25, 38 n.11, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970) ("States may bar their courts from accepting guilty pleas from any defendants who assert their innocence.").

Accordingly, it was not unreasonable for the Appellate Division to conclude that [petitioner] failed to show any prejudice from the alleged failure of counsel to provide him with an accurate explanation of his sentence exposure. [Petitioner] had maintained — and continues to maintain — his innocence and is thereby prohibited under New Jersey law from pleading guilty. *See Taccetta*, 975 A.2d at 935. There can be no prejudice if counsel's deficient performance merely deprived [petitioner] of the opportunity to do something that would have been legally prohibited. *See Nix v. Whiteside*, 475 U.S. 157, 175, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986) (explaining that a defendant who is "persuaded or compelled to desist from perjury . . . has no valid claim that confidence in the result of his trial has been diminished" and thus cannot claim prejudice).

*Davis*, 795 F. App'x at 102-03 (internal citation omitted); *see also Taccetta v. Adm'r New Jersey State Prison*, 601 F. App'x. 165, 168 (3d Cir. 2015) (applying the same reasoning).

Following the Third Circuit's decisions in *Davis* and *Taccetta*, this Court also finds that the Law Division did not unreasonably apply clearly established federal law when it determined that Petitioner failed to establish *Strickland* prejudice considering the Law Division's reliance on the New Jersey Supreme Court's decision in *Taccetta* which prohibits pleading guilty while

maintaining one's innocence.  *Accord Smith v. Johnson*, No. 16-3701, 2021 WL 5240195, at *7 (D.N.J. Nov. 10, 2021).  Therefore, Claim X is denied.

    G.  <u>Claim XI</u>

       In Claim XI, Petitioner argues appellate counsel was ineffective when he failed to raise the issue regarding the trial court's denial of his right to cross-examine Wilson.  More specifically, Petitioner states:

> [t]he defendant was denied his right to cross examine Wilson with information about Hill Jr.  Specifically, Hill Jr. was removed from his father[']s home in South Orange and Wilson then claimed to be the owner, and threatened to kill him.  These threats resulted in various municipal complaints being filed, against Wilson.  Trial counsel however was prevented from cross-examining Wilson about these events during the second trial.

(ECF 35 at 19).  The Law Division analyzed and denied this claim as follows during Petitioner's PCR proceedings:

> Pasha's next argument is that he did not receive effective assistance of <u>appellate</u> counsel. . . .  Generally, the burden, presumption, and <u>prima</u> <u>facie</u> elements associated with an ineffective assistance of trial counsel claim also apply to ineffective assistance of appellate counsel claims.  <u>State v. Harris</u>, 181 N.J. 391, 518 (2004).  However, the analysis associated with the first <u>prima</u> <u>facie</u> element changes slightly – the Court must compare the disputed actions against those of reasonable appellate counsel, not of reasonable trial counsel.  <u>See</u> <u>id.</u> . . .
>
> Pasha's first ineffective assistance of appellate counsel claim is that his appellate counsel was ineffective for failing to raise on appeal that the trial court erred in limiting Pasha's trial counsel's cross examination of Wilson.  Specifically, Pasha avers that the trial court prevented his trial counsel from asking Wilson about several pending charges that Hill, Jr. filed against Wilson, a pending municipal charge against Wilson, and specific instances of heated arguments that occurred between Wilson and Hill, Jr.  Pasha contends that reasonable appellate counsel would have argued that the trial court's decisions regarding the disputed questions constituted an abuse of judicial discretion and that his appellate counsel's failure to make such arguments constitutes a deprivation

of appellate counsel.  The State avers that the trial court did not abuse its discretion and that Pasha's appellate counsel did not argue this point on appeal because he knew that it was a losing argument.

After reviewing the trial record and the trial court's rationale for limiting the disputed cross examination, this Court finds that a reasonable appellate attorney would have exercised his professional judgment and decided that making said argument would have been futile.  As Pasha notes in his brief, the trial court ruled against allowing the disputed cross examination questions because the subject matter of all such questions occurred <u>after</u> the instant murders.  For example, the following exchange took place during Wilson's cross-examination during Pasha's second trial:

> **Defense Counsel**:   Now, did you have an opportunity on November the 5th of 2004 to go to 252 Ward Place in South Orange?
> **Wilson**:  On November –
> **Defense Counsel**:  5th.
> **Wilson**:  I'm not really sure.  Go to South Orange for what?
> **Defense Counsel**:  Did you go there to take over residence at 252 Ward Place?
> **Wilson**:  You're getting into Mr. Hill's legal matter.  I didn't think that had anything to do with this.
> **State**:   Judge, I'm going to object at this point.  About a year after these incidents.
> **Defense Counsel**:  Goes to the witness' credibility, your Honor.
> **The Court**:   I'm going to sustain the objection subject to some proffer from you, [Defense Counsel], which –
> **Defense Counsel**:  Okay.
> **The Court**:  -- we can do at sidebar or on a break.
> **Defense Counsel**:  Yes.  We could do it either way.
> **The Court**:  Members of the jury, why don't we just take a five-minute recess so you can stretch a bit and I'll address this matte[r] with counsel.
> (The following is out of the presence of the jury.)
> **The Court**:  Miss Wilson, can you step outside for a moment.
> (Wanda Wilson le[aves] the courtroom.)
> **The Court**:   Okay [Defense Counsel], what is the subject matter of this inquiry?
> **Defense Counsel**: The subject matter of this inquiry, your Honor, would be to relate to the acts of James

Hill, Jr., as well as Mr. Hill himself to various handguns. As your Honor will recall, James Hill, Jr. was the one who allegedly found the bodies on the night of the murder. He testified that he had access to the house when no one was around. He had keys to the house, he had the alarm code as well as Mr. Hill, Sr. Furthermore, the threats that took place between Miss Wilson and Mr. Hill, Jr. would to to –

**The Court**: What threats are we talking about now?

**Defense Counsel**: The threats that took place on that date where Miss Wilson allegedly threatened to kill him and vice versa on that date.

**The Court**: On November 4th of 2004?

**Defense Counsel**: That's correct.

**The Court**: That would be many months after the murders in this case?

**Defense Counsel**: Well, except it relates back to destruction of property at the pool which is a subject matter of this case. As part of that – as part of that there were alleged that Mr. Hill, Jr. who had access to the property went to the pool and damaged a bar valued at some $8,000.

**The Court**: I'm having trouble following you. Who alleged that Mr. Hill damaged the pool?

**Defense Counsel**: Miss Wilson.

**The Court**: When?

**Defense Counsel**: In November 2004.

**The Court**: You mean subsequent to the murders?

**Defense Counsel**: Yes.

**The Court**: Well, again I'm having trouble deciding how some type of encounter between Miss Wilson and Mr. Hill, Jr. in November of 2004 has anything to do with this case.

**Defense Counsel**: Well, certainly with respect to Mr. Hill, Jr., the fact that on that date that Miss Wilson was able to relate that he had access to handguns, that she knew he had possessed several handguns, and that he was at the scene of the crime, you know, prior thereto, certainly evidence of somebody else's guilt or his access to handguns at that time.

**The Court**: At what time, in August of 2003?

**Defense Counsel**: Well, I'm going to get to that.

**The Court**: Well, then I'm going to ask you to get to it.

**Defense Counsel**: Yeah.

> **The Court**:  If you want to establish through this witness that Mr. Hill's son, James Hill Jr., had access to this home and that he was allowed to go in and out and had the code, so obviously that's permissible.  If you want to establish that at that time he had access to firearms I'll permit that, but I'm not going to get into arguments between Miss Wilson and Mr. Hill in November 2004.    That goes way beyond.    It's collateral and I don't see any connection here.

> (Trial Tr. June 27, 2005, 57:21-61:11).  Although the trial court does not explicitly state that the proffered evidence was irrelevant to Pasha's murder trial, any reader with a basic legal education can identity [sic] such grounds as the motivation behind the trial court's decision.  As the trial court repeatedly explained, the charges filed against Wilson were filed <u>after</u> the instant murders and the arguments between Wilson and Hill, Jr. occurred <u>after</u> the instant murders.  Consequently, reasonable appellate counsel might ignored [sic] this argument and concentrated on claims with a higher likelihood of success.  For this reason, this Court finds that Pasha has not demonstrated an ineffective assistance of counsel claim's first <u>prima</u> <u>facie</u> element and cannot grant Pasha an evidentiary hearing or PCR on this issue.  <u>See</u> <u>Loftin</u>, 191 <u>N.J.</u> at 198.

(ECF 15-2 at 35-38) (emphasis in original).

Claim XI is Petitioner's first asserting an ineffective assistance of *appellate* counsel. "[C]laims of ineffective assistance of appellate counsel are also governed by the *Strickland* standard." *Lusick v. Palakovich*, 270 F. App'x 108, 110 (3d Cir. 2008) (citing *United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000)).  While appellate counsel's decisions are subject to the same ineffective assistance standard applicable to trial counsel claims, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000), "it is a well established principle . . . that counsel decides which issues to pursue on appeal," *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996), and appellate counsel need not raise every nonfrivolous argument a defendant wishes to pursue.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).  As the chief component of effective appellate advocacy is the winnowing out of weaker claims in favor of those with a greater chance of success, *see id.* at 753;

*see also Smith v. Murray*, 477 U.S. 527, 536 (1986), the United States Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *See Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

The Law Division's denial of this claim was not contrary to, nor an unreasonable application of, clearly established federal law. Indeed, the Law Division aptly noted that this argument was not a particularly strong one to raise on appeal. *See, e.g.*, *Sistrunk*, 96 F.3d at 670 (citations and quotations omitted) (observing that counsel has "no duty to raise every possible claim" on appeal, that "[a]n exercise of professional judgment is required," and that "[a]ppealing losing issues runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions"). As noted by the Law Division by implication, what occurred in November 2004, months after the murders, was most likely irrelevant. Furthermore, the trial judge explained to Petitioner's trial counsel that he could examine Wilson on Hill Jr.'s access to the home, access to firearms and his having the alarm code at the time of the murders, something that would have been plainly relevant. Petitioner was clearly given an opportunity to pursue relevant testimony related to Hill Jr. Therefore, Claim XI is denied.

H. Claim XII

In Claim XII, Petitioner asserts appellate counsel was ineffective when he failed to raise an issue on appeal regarding the state's failure to turn over evidence to his trial counsel. More specifically, Petitioner claims the State failed to turn over a police report for harassment and stalking dated November 5, 2004, and a criminal harassment complaint dated January 5, 2005, by Hill Jr. against Wilson prior to his first trial. The Law Division during Petitioner's PCR proceedings analyzed and denied this claim as follows:

Pasha's next argument also relates to the charges that Hill, Jr. filed against Wilson as well as a police report that Hill, Jr. filed against Wilson on November 5, 2004, which accused Wilson of stalking and harassment. Pasha contends that this information constituted <u>Brady</u> material, that the State failed to inform Pasha of these charges during discovery, and that effective appellate counsel would have argued that this <u>Brady</u> violation created grounds for remand of his case.

Before offering its findings regarding ineffective assistance of counsel on this matter, this Court will explain the law associated with <u>Brady</u> material and the corresponding test to determine what qualifies as a <u>Brady</u> violation. Once this law is placed into context, this Court will provide its conclusion as to whether reasonable appellate counsel would have brought this argument to the Appellate Division's attention.

In <u>Brady v. Maryland</u>, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the material either [sic] to guilt or punishment, irrespective of good faith or bad faith of the prosecution." 373 <u>U.S.</u> 83, 87, 83 <u>S.Ct.</u> 1194, 1196-97, 10 <u>L.Ed.2d</u> 343, 351-52 (1976); <u>State v. Knight</u>, 145 <u>N.J.</u> 233, 245 (1996). To establish that a <u>Brady</u> violation occurred, "[a] defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and [that] (3) the evidence [was] material [to the defendant's case]." <u>State v. Martini</u>, 160 <u>N.J.</u> 248, 268 (1999). "Evidence is 'material' if there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>Id.</u> (citing <u>United States v. Bagley</u>, 473 <u>U.S.</u> 667, 682, 105 <u>S.Ct.</u> 3375, 3383, 87 <u>L.Ed.2d</u> 481, 494 (1985)). Similar to the test associated with an ineffective assistance of counsel claim's second <u>prima facie</u> element, a "reasonable probability" is a probability sufficient to undermine the reviewing court's confidence in the proceeding's outcome. <u>Id.</u>

Here, Pasha asserts that the State's failure to pass information regarding the pending charges against Wilson and the police report that described the stalking and harassment qualifies as a <u>Brady</u> violation. However, no evidence suggests that this information was material to Pasha's case. In fact, the court record, excerpted in the above discussion, indicates that Pasha's trial counsel knew of the charges against Wilson and attempted to use them during cross-examination. The State objected to this line of questioning and the trial court sustained said objection, ruling that the charges had no relevance to Pasha's murder trial because they were filed after

someone murdered Baraka and Holmes.  Applying this same logic, this Court finds that the trial court would have excluded questions about the disputed police report, which was also filed after Pasha murdered Baraka and Holmes.  As the charges filed against Wilson were excluded at trial and the report would have been excluded, this Court finds that the State's alleged failure to pass said information during discovery could not have impacted the outcome of Pasha's trial and cannot be considered material and contribute to a <u>Brady</u> violation.  <u>See</u> <u>Martini</u>, 160 <u>N.J.</u> at 268.  This Court further finds that reasonable appellate counsel would have arrived at the same conclusion, which means that Pasha has failed to demonstrate that his appellate counsel's performance fell below an objective standard and that this Court will not grant him PCR or an evidentiary hearing regarding this issue.  <u>See</u> <u>Loftin</u>, 191 <u>N.J.</u> at 198.

(ECF 15-2 at 39-40).

A due process violation under *Brady* "occurs if: (1) the evidence at issue is favorable to the accused, because either it is exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'"  *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (citations omitted).  Materiality requires "a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different."  *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).  Even if evidence is determined to be inadmissible, it "can still be *Brady* material where it could lead to admissible evidence[.]"  *Gibson v. Sec'y Pa. Dep't of Corr.*, 718 F. App'x 126, 131 (3d Cir. 2017) (citing *Dennis v. Sec'y Pa. Dep't of Corr.*, 834 F.3d 263, 309-10 (3d Cir. 2016) (en banc)).  However, "[m]ere speculation that the suppressed evidence might have led to admissible evidence is insufficient to render otherwise inadmissible evidence into *Brady* material."  *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 109 (1976); *United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994)).

Petitioner's trial counsel knew about the relevant evidence at issue during Petitioner's second trial as noted by the colloquy between the parties and the trial court during Petitioner's second trial.  Thus, it certainly was not *Brady* evidence by the time of Petitioner's second trial.

Additionally, Petitioner fails to show that, even if the evidence was not disclosed to Petitioner's trial counsel at the time of his first trial, that it was material. Petitioner fails to come forward with anything beyond possible speculation that had this evidence been disclosed at his first trial that it would have led to admissible evidence that would have changed the outcome of his first trial to a reasonable probability.

At a minimum, Petitioner fails to show that this evidence was *material* under the relevant *Brady* standard for Petitioner's first trial. Even if purported evidence related to Hill's November 2004 police report against Wilson was disclosed at the time of his first trial, this Court fails to see how it would have changed the verdicts related to Petitioner's convictions of him making terroristic threats, stalking and false imprisonment against Wilson to a reasonable probability as these events all occurred months prior to any purported incident between Wilson and Hill. Accordingly, Petitioner is not entitled to federal habeas relief on Claim XII.

I. <u>Claim XIII</u>

In Claim XIII, Petitioner asserts appellate counsel was ineffective by failing to argue on appeal that the trial court erred by allowing expert DNA testimony over his objection. The Law Division denied this claim as follows during Petitioner's PCR proceedings:

> Pasha's fifth ineffective assistance of appellate counsel claim is that his appellate counsel should have argued that the trial court deprived Pasha of his right to confront his accuser when it permitted Dr. Cotton to testify at trial. Pasha contends that reasonable appellate counsel would have raised such an argument because Dr. Cotton did not conduct or supervise the relevant tests. <u>Bullcoming v. New Mexico</u>, 564 <u>U.S.</u> 647, 131 <u>S.Ct.</u> 2705, 2716, 180 <u>L.Ed.2d</u> 610, 623 (2011); <u>State v. Berezansky</u>, 386 <u>N.J. Super.</u> 84, 100 (App. Div. 2006).
>
> The State's response contains two counterarguments. The first is that none of the cases that Pasha uses to bolster his claim addresses situations analogous to his own. The State concedes that Dr. Cotton did not conduct the tests used to create the report or supervise the

laboratory employee who conducted the report, but maintains that the report was never admitted into evidence – unlike all of the cases that Pasha cites to in his brief.  See Bullcoming, 564 U.S. at 47, 131 S.Ct. at 2712, 180 L.Ed.2d at 618 ("The trial court overruled the [Confrontation Clause] objection . . . and admitted the . . . report as a business record."); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 307, 129 S.Ct. 2527, 2530, 174 L.Ed.2d 314, 319 (2009) ("The Massachusetts courts in this case admitted into evidence affidavits reporting the results of forensic analysis."); Berezansky, 386 N.J. Super. 88-89 ("Over defendant's objection, the trial judge found that the laboratory certificate was properly admitted into evidence under the business records exception to the hearsay rule.").

The State's second counterargument is that, at the time Pasha filed his appeal, it was well-established that a violation of the Confrontation Clause was subject to harmless error analysis.  Del v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674, 686 (1986).  Pursuant to this rule:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Id. at 84, 106 S.Ct. at 1438, 89 L.Ed.2d at 686-87.  The State then summarizes the incriminating evidence that it produced at trial, indicates that Pasha produced his own DNA expert who testified that Pasha could be excluded as a match against the collected DNA samples, and concludes that reasonable appellate counsel would not have challenged Dr. Cotton's testimony under the Confrontation Clause.

This Court agrees with the State.  Pasha's appellate counsel cannot be held to a standard of reasonableness that did not exist at the time Pasha filed his appeal.  See Strickland, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694 ("A fair assessment of attorney

performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.") (emphasis added). Pasha filed his appeal in 2008. Pasha, No. A-1590-05T4. A review of New Jersey and federal case law provides that a Confrontation Clause violation was subject to harmless error analysis at that time. Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438, 89 L.Ed.2d at 686 (1986). Correspondingly, reasonable appellate counsel might have decided that raising such an argument on appeal would have been futile and concentrated on different endeavors.

Reasonable appellate counsel might have come to such a conclusion after considering the strength of the State's case against Pasha, Pasha's trial counsel's cross-examination of Dr. Cotton, and the testimony offered by Pasha's own DNA expert. In the instant circumstances, the state created a cohesive case theory incorporating the testimony of multiple witnesses and the inclusion of many pieces of evidence, including the location of Holmes' truck, the EZ-Pass transponder information, the phone calls that Pasha made from three bus stations, Carpenter's testimony, and the recovered jackets and jewelry. Additionally, Pasha's trial counsel successfully established that Dr. Cotton did not conduct any of the relevant DNA tests and that Pasha's own DNA expert, who had conducted the necessary tests, excluded Pasha as a source of the DNA inside Holmes' vehicle. For these reasons, Pasha has failed to demonstrate that a reviewing court would have resolved the harmless error analysis in his favor, that reasonable appellate counsel would have argued this point on appeal, or that such an argument would have impacted his appellate proceedings. Consequently, Pasha has not demonstrated the prima facie elements of an ineffective assistance of counsel claim and this Court denies all requested relief.

(ECF 15-2 at 45-48).

As outlined above, the Law Division denied this claim finding that Petitioner failed to satisfy either prong of *Strickland*'s ineffective assistance of appellate counsel inquiry. Effective appellate counsel must "select the most promising issues for review," not every possible claim. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (explaining that an experienced advocate will emphasize "the importance of winnowing out weaker arguments on appeal and "focusing on a few key issues."")). To overcome the presumption of effective assistance of counsel, a petitioner must

show that counsel ignored issues that are "clearly stronger than those presented." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

Petitioner's appellate counsel raised several claims on direct appeal. *See Pasha*, 2008 WL 2917172, at *3-4. The Law Division determined that Petitioner's appellate counsel's decision not to raise this Confrontation Clause claim was not objectively unreasonable. The Law Division also aptly noted that this claim would have been rejected on appeal such that there was no prejudice. For the reasons stated below, this denial was not contrary to, nor an unreasonable application of, clearly established federal law.

The Confrontation Clause of the Sixth Amendment states that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The Fourteenth Amendment renders the [Confrontation] Clause binding on the States." *Michigan v. Bryant,* 562 U.S. 344, 352 (2011) (citing *Pointer v. Texas,* 380 U.S. 400, 403 (1965)). Pursuant to the Confrontation Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington,* 541 U.S. 36, 59 (2004) (footnote omitted). "As to the second requirement, the Confrontation Clause requires that a defendant have had 'a full and fair opportunity to probe and expose [testimonial] infirmities' of an unavailable government witness in order for that witness's prior testimony to be admissible." *Ross v. Dist. Attorney of Cnty. of Allegheny,* 672 F.3d 198, 206–07 (3d Cir. 2012) (citing *United States v. Owens,* 484 U.S. 554, 558 (1988) (quoting *Delaware v. Fensterer,* 474 U.S. 15 (1985))). The Confrontation Clause applies to testimonial hearsay that is admitted to establish the truth of the matter asserted. *See Crawford,* 541 U.S. at 59 n.9 ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the

34

truth of the matter asserted.") (citation omitted).  "[S]tatements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial are testimonial."  *United States v. Hinton,* 423 F.3d 355, 360 (3d Cir. 2005).

Harmless error analysis applies to the admission of testimonial hearsay in violation of the Confrontation Clause.  *See United States v. Jimenez,* 513 F.3d 62, 78 (3d Cir. 2008) (citations omitted).  Accordingly, to prevail a habeas petitioner must establish that a constitutional error resulted in "actual prejudice, *i.e.*, that it had a "substantial and injurious effect or influence in determining the jury's verdict."  *Eley v. Erickson,* 712 F.3d 837, 847 (3d Cir.2013) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637–38 (1993)).

In this case, the Law Division determined that Petitioner failed to show *Strickland* prejudice because raising this claim would not have affected his appeal.  Indeed, the Law Division cited to the harmless error rule in *Van Arsdall* and aptly applied that rule to the evidence produced at trial to find that any potential Confrontation Clause violation, by permitting the government's DNA expert to testify, was harmless.  This Court finds such a decision was not contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, Claim XIII is denied.

J.  <u>Claim XIV</u>

In Claim XIV, Petitioner argues appellate counsel was ineffective when he failed to object to the trial court's denial of his request for Wilson's financial and marital records.  More specifically, Petitioner asserts this information was critical "to establish the Defendant's affirmative defense at trial," namely that he and Wilson were often together as a couple and not in a period of separation as Wilson testified at trial.  Additionally, Petitioner states these records would have shown that he drove Wilson to work even after there were alleged incidents of domestic violence.

Petitioner sought marital and financial records from Wilson before his first trial. This request was initially discussed during an August 2, 2004, hearing. The trial judge found Petitioner's trial counsel's request was far too expansive. More specifically, the trial judge noted as follows:

> a criminal case is not an opportunity to conduct a wide-ranging inquiry into an alleged victim's financial condition and so here since the State is alleging certain specific Motion property that was damaged, then I believe that you're entitled to whatever information the State has and whatever records the State has that it intends to rely on or it has even if it doesn't intend to rely on the information to address, you know, that particular count of the indictment. I don't believe that you are entitled based upon this indictment to all of the financial information that the victim may have or all of the financial information -- the marital financial information that exists. This is not a divorce proceeding. There are very specific crimes alleged here, few of which have any economic import, a couple of which have some, you know, issue relating to value of property and, frankly, I think the Code of Criminal Justice also makes it pretty clear that even if this defendant did have an interest in some of the property he surely didn't have a right to destroy it or damage it, thereby distinguishing the interest of the alleged victim, so I think that, you know, your request to a certain extent is valid, but beyond that it's really going far beyond what you're entitled to and intrudes upon the privacy and the interest of the victim.

(ECF 18-2 at 5). When Petitioner's trial counsel requested financial records of Wilson including her credit card and check statements, the trial court stated as follows at the August 2, 2004, hearing:

> We have an indictment here and the indictment alleges certain acts of domestic violence and you're entitled to whatever information there is that's relevant to these acts of domestic violence, but you're not entitled to the life history of this victim. I mean I think even you would concede whether – you know, agree with the State's allegations about domestic violence, you would concede this was a very traumatic marriage and then this person suffered the loss of her sister and a friend, she doesn't need to be traumatized further by some type of, you know, wide ranging inquiry into her personal affairs. You're entitled to the information that relates to these charges. This – discovery request of yours reads like a discovery request in a divorce case, maybe even broader than that, and that's not what we're dealing with.

(*Id.* at 10).  The trial judge then told Petitioner's counsel he needed to draft a narrower subpoena

for the records rather than asking for all of Wilson's financial records.  (*See id.* at 11).

Subsequently, Petitioner's trial counsel then noted during the hearing that the financial records

were for accounts used by both Wilson and Petitioner during the marriage to which the trial judge

noted that Petitioner could presumably sign releases himself to obtain the record information.  (*See*

*id.*).

The Law Division denied this ineffective assistance of appellate counsel claim during

Petitioner's PCR proceedings as follows:

> In his final ineffective assistance of appellate counsel argument,
> Pasha asserts that his appellate counsel failed to challenge the trial
> court's decisions regarding Pasha's request for Wilson's financial
> and marital records.  Pasha contends that this inaction was
> unreasonable because "[the] information was critical to establish
> [Pasha]'s affirmative defenses at trial."  However, Pasha never
> explains what affirmative defenses he is referring to or how they
> would have helped him.  Pasha avers that these records could have
> been used to impeach Wilson's credibility because they would have
> shown that Pasha and Wilson spent time together while they were
> separated (after the instances of domestic violence).
>
> This Court finds that it cannot grant Pasha an evidentiary hearing or
> PCR to explore these issues because Pasha has not identified what
> his affirmative defenses were, how financial statements could
> demonstrate that he and Wilson spent time together, or what he
> means when he uses the term "marital records."  This dearth of
> information, once again, leads this Court to conclude that Pasha has
> failed to provide specific details that, if this Court believed to be
> true, could form the basis for a judicial opinion.  Mitchell, 126 N.J.
> at 579.

(ECF 15-2 at 48-49) (internal citation omitted).

Petitioner is not entitled to federal habeas relief on this claim.  As noted by the Law

Division, Petitioner does not specify what he means by "marital" records.  Furthermore, the trial

court aptly noted that Petitioner's requests for credit card and check records were far too expansive.

Indeed, Petitioner's trial counsel even admitted on the record before the trial court that the accounts were used by both Petitioner and Wilson such that Petitioner himself presumably would have had access to these records directly.

This Court finds that Petitioner fails to show that appellate counsel was ineffective for failing to raise this issue on appeal as it was meritless, and/or fails to show that had this issue been raised on appeal, his appeal would have been successful to a reasonable probability.  Accordingly, Claim XIV is denied.

K.  <u>Claim XV</u>

In Claim XV, Petitioner asserts trial counsel was ineffective in failing to request a mistrial when a juror was threatened.  The Law Division during Petitioner's PCR proceedings analyzed and denied this claim as follows:

> Pasha argues that his trial counsel should have moved for a mistrial after a juror reported that a black male followed him out of the courthouse and yelled that Pasha was a liar and that he, the juror, had to do the "right thing."  Pasha also asserts that his trial counsel was ineffective for failing to ask the trial court to question the other jurors to see if they were aware that one of their peers had been threatened or if they had been threatened themselves.  Pasha contends these failures resulted in an unfair and biased verdict.  The State argues that the juror informed the trial court that he had not told any of his peers about this incident and that the incident had no influence on his ability to be fair and impartial.  The State further explains that Pasha's trial counsel requested that the trial court dismiss the threatened juror and that the trial court denied this request.  The State reasons that these actions demonstrate that the trial court would have denied a motion for a mistrial had Pasha's trial counsel made one. . . .
>
> This Court finds that none of Pasha's mistrial arguments demand an evidentiary hearing or PCR.  It is abundantly clear that either the trial court, Pasha's trial counsel, or both parties, took definite curative measures to prevent Pasha from suffering any constitutional violations after each of the described incidents.  As such, Pasha cannot demonstrate either of an ineffective assistance of counsel claim's <u>prima</u> <u>facie</u> elements – objectively competent counsel would

> have recognized the futility of requesting a mistrial and Pasha's trial
> counsel's failure to make the disputed requests did not alter Pasha's
> conviction proceedings.  See Loftin, 191 N.J. at 198.

(ECF 15-2 at 23-25).

The Sixth Amendment guarantees a criminal defendant "the right to a . . . trial [ ] by an impartial jury."  U.S. Const. amend VI.  This right is applicable to a defendant in state court through the Fourteenth Amendment.  *See Ristaino v. Ross,* 424 U.S. 589, 595 n. 6 (1976).  Jurors are presumed to be impartial.  *See Irvin v. Dowd,* 366 U.S. 7171, 723 (1961).  Additionally, a defendant's right to "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. . . .  Due process means a jury capable and willing to decide the case solely on the evidence before it[.]"  *Smith v. Phillips,* 455 U.S. 209, 217 (1982).

A trial court has the duty to conduct a hearing with respect to jury impartiality when there is evidence of extraneous influences on the jury.  *See United States v. King,* 627 F.3d 641, 650 (7th Cir. 2010) ("A judge's duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.") (internal quotation marks and citation omitted); *United States v. Maye,* 241 F. App'x 638, 641 (11th Cir. 2007) ("[T]he district court abuses its discretion, or plainly errs, in failing to hold an investigatory hearing only when there is evidence that the jury was subjected to influence by outside sources.") (internal quotation marks and citation omitted); *United States v. Davis,* 177 F.3d 552, 557 (6th Cir. 1999) ("Where a colorable claim of extraneous influence has been raised . . . a . . . hearing must be held to afford the defendant an opportunity to establish actual bias.") (internal quotation marks and citation omitted); *United States v. Thornton,* 1 F.3d 149, 155 (3d Cir. 1993) ("We have previously expressed a preference for individual juror colloquies [w]here there is a *significant possibility* that a juror . . . has been exposed to prejudicial *extra-record* information.")

(emphasis in original) (internal quotation marks and citations omitted); *United States v. Watchmaker,* 761 F.2d 1459, 1465 (11th Cir. 1985) ("[T]he failure to hold a hearing constitutes an abuse of discretion only where there is evidence that the jury was subjected to influence by outside sources.") (citation omitted); *see also Jenkins v. Bartkowski*, No. 10-4972, 2014 WL 2602177, at *15 (D.N.J. June 11, 2014).

There is a key distinction between intra-jury communications and extra-jury influences as extra-jury influences "pose a far more serious threat to the defendant's right to be tried by an impartial jury." *See United States v. Resko,* 3 F.3d 684, 690 (3d Cir. 1993). "[W]hen the allegation of jury taint arises pre-verdict, 'the trial court has wide discretion to fashion an appropriate procedure for assessing whether the jury has been exposed to substantively damaging information, and if so, whether cognizable prejudice is an inevitable concomitant of that exposure.'" *Reed v. Carroll*, No. 04-326, 2005 WL 2086745, at *7 (D. Del. Aug. 26, 2005) (quoting *United States v. Bradshaw,* 281 F.3d 278, 290 (1st Cir. 2002)).

The trial court conducted a hearing with counsel and the affected juror upon learning of the potential taint. (*See* ECF 22 at 9-19). The juror told the trial judge that someone told him as he was leaving court "he's a F'ing liar, you know what to do." (*See id.* at 12). The juror did not discuss this incident with any of the other jurors. (*See id.*). The juror then stated he was not sure which side of the case the person who spoke to him was supporting. (*See id.* at 13). The juror explained to the trial judge the incident would not affect his ability to be impartial "at this time," but that if it happened again, he would probably ask to be taken off the jury because he did not "need the harassment." (*See id.* at 13-14). The juror did not fear for his safety after this incident. (*See id.* at 14-15). The trial judge told the parties he viewed the juror as candid, but that he did not interpret the utterance as a threat. (*See id.* at 17). The trial judge though reserved judgment on

Petitioner's counsel's request that the juror be excused noting that he disagreed with counsel's assessment that the juror appeared to be afraid.  (*See id.* at 18, 19).

    As detailed above, the Law Division found that Petitioner failed to meet both *Strickland* prongs on this claim.  The Law Division's denial was neither contrary to, nor an unreasonable application of, clearly established federal law such as *Strickland* and its progeny.  Indeed, the trial judge properly questioned the affected juror and determined that he could still be impartial.  There was no indication that any other jurors needed to be interviewed by the trial court given the affected juror's statements to the trial judge and the parties that he told no one else about this incident.

This Court fails to see how the outcome of Petitioner's trial would have been different to a reasonable probability had trial counsel asked for a mistrial (as opposed to his request that the juror be excused, which was denied by the trial judge).  This is particularly true given that the trial judge found that the juror could remain empaneled.  Furthermore, the Law Division's denial of Petitioner's argument that trial counsel should have asked the entire panel about the incident was not an unreasonable denial given that the affected juror testified that he told no one about the incident, and there was nothing in the record to indicate other jurors were involved in the altercation when the utterance was only heard by the one affected juror.  Accordingly, Claim XV is denied.

L.  Claim XVI

Next, Petitioner asserts that trial counsel was ineffective when he failed to object to prior bad acts testimony by Robert Carpenter that Petitioner owned a gun.  The Law Division during Petitioner's PCR proceedings analyzed and denied this claim as follows:

> Pasha also argues that his trial counsel failed to object to evidence that the State presented to the jury and that this inaction constitutes ineffective assistance of counsel. . . .
>
> The . . . evidentiary argument that Pasha presents is that his trial counsel was deficient for not objecting to testimony that the State elicited from Carpenter.  Specifically, Carpenter informed the jury that Pasha had owned a gun during his childhood in Newark, New Jersey.   Pasha asserts that, pursuant to N.J.R.E. 404(b), this constituted improper character evidence.  Pasha argues that his trial counsel's failure to object to this statement deprived Pasha of a fair trial.   The State avers that Pasha mischaracterizes Carpenter's statement.  The State explains that the State had asked Carpenter if he was claiming that the police forced him into saying that he knew Pasha had owned guns.  Carpenter's corresponding answer included the statement that, "growing up in Newark everybody had guns. . ." (Trial Tr. June 29, 2005, 122:23-24).  The State probed further and asked whether Carpenter meant to include Pasha in that generalization and Carpenter answered, "All of us, yeah.  I told you that.  I said everybody we ran with had guns."  (Trial Tr. June 29, 2005, 123:2-3).  The State further argues that Pasha's trial counsel neutralized any negative impact that Carpenter's testimony had when, during his cross-examination of Carpenter, Carpenter informed the jury that Pasha had engaged in various types of community service, such as teaching life management skills to inmates and working with children. . . .
>
> Pasha has not demonstrated that the lack of an objection in response to the disputed firearms testimony actually impacted his conviction proceedings – the evidence that supported his conviction would have made such an objection moot.  Because Pasha has not established an ineffective assistance of counsel claim's second prima facie element regarding this firearms testimony and because petitioners must demonstrate both elements to obtain the benefit of an evidentiary hearing, this Court finds that this argument fails as a matter of law[.]  Id.

(ECF 15-2 at 28-30).

The Law Division's denial of this claim was not contrary to, nor an unreasonable application of, clearly established federal law such as *Strickland*'s prejudice prong. The evidence against Petitioner clearly linked him to the crimes for which he was convicted. By way of example only, this included relevant EZ-Pass transponder information, telephonic evidence and relevant evidence that was in or at one time in Carpenter's possession and with whom Petitioner was with after the murders. *See, e.g.*, *Lynn v. Walsh*, No. 12-1710, 2015 WL 672231, at *40 (M.D. Pa. Feb. 17, 2015) (noting in part petitioner cannot establish *Strickland* prejudice based on admission of prior bad acts testimony given strong evidence against him). Therefore, Claim XVI is denied.

M. Claim XVII

Finally, Petitioner asserts trial counsel was ineffective when he failed to call a domestic violence expert as a witness at trial. The Law Division during Petitioner's PCR proceedings analyzed and denied this claim as follows:

> Pasha also contends that his trial counsel was ineffective for failing to call a domestic violence expert to the stand. Pasha argues that such an expert would have testified that domestic violence victims have a tendency to fabricate stories in order to obtain a temporary restraining order. Pasha asserts that the Office of the Public Defender refused Pasha's request to obtain an expert and that this denial prevented him from producing a report that substantiates his argument.

> The State argues that Pasha has failed to show that such an expert exists, that this field of expertise is scientifically reliable, or that the alleged expert's testimony would have been relevant. The State further contends that witnesses are prohibited from commenting on whether another witness is lying. See State v. Frisby, 175 N.J. 583, 593-94 (2002) (finding that police officers could not present hearsay testimony "as the foundation for . . . wholly improper credibility evaluation[s]").

> Contrary to Pasha's explanation as to why he did not provide this Court with an expert report on domestic violence and its implications on his case, three separate attorneys drafted briefs in furtherance of Pasha's instant petition. Despite this combined

> effort, Pasha failed to provide facts or proofs that further his claim. He has even failed to provide the name of an expert or scholarly article that remotely validates his assertion. Because PCR petitions are legal devices that defendants may use to vindicate actual claims, but not to identify potential claims, Marshall [(III)], 148 N.J. at 270, this Court finds that Pasha's instant argument lacks the details required to substantiate a decision to grant PCR. Mitchell, 126 N.J. at 579.

(ECF 15-2 at 33).

Petitioner is not entitled to federal habeas relief on this claim as he fails to make the necessary *Strickland* prejudice showing. "To make a sufficient showing of prejudice for failure to call an expert witness, a Petitioner must offer *evidence* that an expert would have testified favorably on his behalf and that the testimony would have affected the outcome of the trial." *Spangle v. United States*, No. 17-485, 2018 WL 11309916, at *7 (C.D. Cal. Aug. 20, 2018) (emphasis added) (citing *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001)). Merely speculating on what an expert might have testified to is insufficient to show *Strickland* prejudice. *See id.* (citations omitted); *see also Fulton v. United States*, No. 18-16526, 2020 WL 133288, at *5 (D.N.J. Jan. 13, 2020) ("As Petitioner has failed to provide a sworn statement or other competent evidence of what testimony the alleged uncalled witnesses would have provided, including any evidence that he could have procured an expert . . . Petitioner has failed to show any prejudice from counsel's alleged failure to call these additional witnesses."); *Benton v. LaClair*, No. 14-6012, 2015 WL 1003847, at *6 (W.D.N.Y. Mar. 5, 2015) (noting where petitioner provided no evidence that an expert was available or that the expert would have testified favorably if called leads the Court to conclude that it cannot say whether expert testimony, if admitted would have been sufficiently compelling to call into question the outcome of the trial) (citations omitted); *Karamanos v. United States*, No. 04-171, 2005 WL 2777552, at *4 (D.N.J. Oct. 24, 2005) (noting prejudice cannot be based on mere speculation on what witnesses would have said and that

petitioner cannot show prejudice where petitioner failed to provide sworn statements of facts from witnesses detailing their proposed testimony).

As fully detailed by the Law Division, Petitioner failed to come forward with any competent evidence, *i.e.*, an affidavit or declaration from a possible expert as to what he would have testified to, to show that he suffered prejudice with respect to counsel's failure to obtain a domestic violence expert.  Accordingly, Claim XVII is denied.

## V.      CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Applying this standard, this Court finds that a certificate of appealability shall not issue in this case.

## VI.     CONCLUSION

For the foregoing reasons, Petitioner's habeas petition is denied.  A certificate of appealability shall not issue.  An appropriate order will be entered.

DATED:  November 7th , 2022

s/ *Georgette Castner*

_____
GEORGETTE CASTNER
United States District Judge